IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA   )
   )
      PLAINTIFF,   )
   )
   v.   )CIVIL ACTION NO. <u>2:07-cv-687-MEF</u>
   )
APPROXIMATELY TWELVE THOUSAND )
($12,000) DOLLARS IN UNITED   )
STATES CURRENCY,   )
   )
      DEFENDANT.   )

<u>UNITED STATES' RESPONSE TO CLAIMANT'S
MOTION FOR SUMMARY JUDGMENT</u>

Comes now the United States of America ("United States"), by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and Tommie Brown Hardwick, Assistant United States Attorney, and in response to Claimant's motion for summary judgment, submits the following:

<u>Pertinent Facts</u>

In December, 2005, the Dothan Police Department ("DPD")made an arrest of Rodney Caliste for Trafficking in Cocaine and Possession of Marijuana First Degree.  (Exhibit A, Affidavit of Sgt. Andy L. Martin).  As a result of Caliste's arrest, the DPD learned of a drug organization going by the name of "The Untouchables."  *Id.*  The Untouchables' membership included, among others, Derrick Davis, Alton Rivers and Kionne Johnson. *Id.* Members of The Untouchables were seen frequenting a relatively new local night club named "Club Rio."  The DPD began targeting certain members of Club Rio who were also associated

with the Untouchables. (Exhibit A, p. 1).

The Drug Enforcement Administration ("DEA") identified Davis as being involved in cocaine and marijuana trafficking. Moreover, Davis had been previously arrested by the Houston County Sheriff's Office for Marijuana Possession First Degree and placed on pre-trial diversion.

On January 18, 2007, the DPD responded to the rear parking lot of the Holiday Inn Express, located at 3071 Ross Clark Circle, Dothan, Alabama, in reference to reported drug activities. (Verified Complaint)[1].  The information provided to the DPD was that a black male in a white Chevrolet Suburban and two black males in a tan Dodge Magnum were involved in a drug transaction in the parking lot. *Id.*

Upon arrival, detectives did observe two black males in a Dodge Magnum, with Derrick Wesley Davis ("Davis") located in the driver's seat.  (Verified Complaint).  Detectives could smell a strong odor of raw marijuana when they approached the car, and they also observed a handgun on the driver's floor board.  When asked if he had any weapons, Davis acknowledged that his handgun was on the floorboard of the driver's seat.  Davis stated that he had a permit for the handgun, although no permit was located at the scene. Detectives searched the vehicle and found residue of

---

[1]     The facts are taken from the Verified Complaint unless otherwise designated.

marijuana.  During a pat down of Davis, the detectives felt a large bulge in both of Davis' pants pockets.  The bulges turned out to be U.S. currency.  Davis claimed the defendant currency was proceeds of his income tax return.  *Id.*  Davis later stated that he had approximately $8,500, and some of the money was from Club Rio.  (Verified Complaint; Exhibit B, p. 2)  Davis was arrested on drugs and weapon charges.

Inv. Tim Miller found a small bag of marijuana in the front pocket of the passenger, James Simpson.[2]  (Exhibit B, p. 1-2).

The investigation led the detectives to rooms 247 and 249 of the Holiday Inn Express, where the detectives used a canine ("K-9") to sniff the doors of the two rooms.  The canine was trained to detect the presence of controlled substances.  The canine alerted to the presence of a controlled substance, or the by-products, chemicals or substances associated with drug production, in both rooms.  Based upon the K-9 alert, detectives secured a search warrant for the rooms.

Upon entering Room 247, officers detected a strong odor of marijuana.  A search of the room yielded two large plastic gallon-size bags containing marijuana residue, a set of digital scales, two boxes of plastic sandwich baggies, and three stacks of U.S. currency totaling approximately $14,000 which was seized

---

[2]     Simpson initially told Inv. Miller that his name was Henry DeJohn.

as drug proceeds. The currency was packaged in two $5,000 stacks, and one stack of currency which totaled $4,000. Room 247 was registered to Kionne Edward Johnson, a person known to the detectives to be a drug trafficker in the Dothan area, and a criminal associate of Davis.

Like room 247, officers executing the warrant for room 249, detected a strong odor of raw marijuana. While no marijuana or U.S. currency was found in room 249, a set of digital scales and miscellaneous paperwork were discovered. Room 249 was registered to Alton Rivers. Rivers was also known as a drug trafficker in the Dothan area, and a criminal associate of Davis.

The United States submits that there are additional facts that cannot be disputed by the claimant that provide a nexus between the defendant currency and criminal activity. Within the paperwork taken from room 249 were documents showing that Derrick Davis rented a storage bin in Dothan, Alabama. As officers walked two K-9s near the storage bin the two K-9s alerted to the presence of a controlled substance. Based upon this information, a search warrant was secured and executed at the storage bin. Although there was a strong odor of raw marijuana in the storage bin, no drugs were located.

During the investigation at the Holiday Inn Express, Officers observed a pick-up truck parked in the rear parking lot of the Holiday Inn Express. (Exhibit 1, p. 2). The pick-up truck

was a rental truck from Hertz.  Inside the pick-up truck was
clothing from a cleaners bearing the name Alton Rivers and a
small bag of marijuana.  *Id.*  It was later learned that the pick-
up truck had been rented by Derrick Davis on January 10, 2007.
*Id.*  At the time of Davis' arrest, he was driving his
girlfriend's car.

<u>Procedural History</u>

On July 27, 2007, the United States filed its Verified
Complaint for Forfeiture <u>In</u> <u>Rem</u> (Doc. #1).  The Court being
satisfied that there was "probable cause to believe that the
defendant currency ... constitut[ed] property involved in or
traceable to" illegal activity, issued a warrant for arrest <u>in</u>
<u>rem</u> on August 13, 2007.  (Doc. #4).

On August 30, 2007, Davis filed his answer and verified
statement identifying interest in the seized property.  (Doc.
#8).  The Court filed its Uniform Scheduling Order on September
29, 2007.  Thereafter, the claimant filed his motion for summary
judgment on the grounds that (1) there is an insufficient nexus
between the defendant currency and any criminal activity; (2)
that the defendant currency had a legitimate source (i.e. an
independent source  and is not traceable to criminal activity);
and (3) that the law enforcement officer made an illegal stop of
Davis' vehicle.

## Discussion

**I.    Standard of Review.**

The Federal Rules of Civil Procedure, Rule 56(c) governs
summary judgment.  Under Rule 56(c), "summary judgment is
appropriate 'if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law.'"  *Celotex Corp. v. Catrett,* 477 U.S. 317,
322 (1986).  However, "[w]hen considering a motion for summary
judgment, the Court must evaluate all of the evidence, together
with any logical inferences, in the light most favorable to the
nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
254-55 (1986).  Moreover, the "Court may not... make credibility
determinations or weigh the evidence" in reaching its decision.
*Id.* at 255. When the nonmoving party has the burden of proof at
trial, the moving party may carry its burden at summary judgment
either by presenting evidence negating an essential element of
the nonmoving party's claim, or by pointing to specific portions
of the record which demonstrate that the nonmoving party cannot
meet its burden of proof at trial.  *Clark v. Coats & Clark, Ind.*,
929 F.2d 604, 606-608 (11th Cir. 1991).

**II.   Analysis**

**A.    The defendant currency is subject to forfeiture as**

6

**proceeds traceable to a controlled substance offense.**

Claimant has failed to inform the district court that defendant currency is not subject to forfeiture as proceeds traceable to a controlled substance offense. Although Davis attempts to satisfy his burden at summary judgment by negating the nexus element of the Untied States' forfeiture claim, he has failed to present evidence in support of his argument. Davis' motion and exhibits amount to mere conclusory statements that there is no nexus between the defendant currency and drug related activities. <u>See</u> (Claimant's Motion, Doc. 13. p. 4). The Eleventh Circuit has "'consistently held that conclusory allegations without specific supporting facts have no probative value.'" *Leigh v. Warner Bros., Inc.,* 212 F.3d. 1210, 1217 (11th Cir. 2000) (*quoting Evers v. General Motors Corp.,* 770 F.2d 984, 985 (11th Cir. 1985)).

Pursuant to 21 U.S.C. § 881(a)(6),

"[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [subchapter 13], all proceeds traceable to such an exchange, and all money, negotiable instruments, and securities used or intended to be used to facilitate any violation of [subchapter 13]." Property subject to forfeiture includes all moneys given or intended to be given in exchange for illegal drugs, the proceeds of such an exchange, and all moneys used or intended to be used to facilitate a violation of the drug laws."

Drawing all reasonable inferences from the Verified Complaint and viewing the evidence in the light most favorable to

7

the nonmoving party, Davis' motion for summary judgment should be denied.  There are several facts that support a finding, by a preponderance of the evidence, that Davis was involved in criminal activity.  First, Davis was driving his girlfriend's car at the time of his arrest.  Law enforcement officers noticed a pick-up truck with its lights on in the parking lot of the Holiday Inn Express near Rooms 247 and 249. Inside the truck, in plain view, officers noticed a large amount of dry cleaning with the name Alton Rivers on them.  Cpl. Brad Cain walked his K-9 around the vehicle and the K-9 alerted to the presence of narcotics in the truck.  The K-9 was also walked pass Rooms 247 and 249, and alerted to the presence of narcotics in both rooms. As a result of the K-9 alert, search warrants were acquired and executed on both rooms.  *See $26,620.00 in U.S. Currency*, 2006 WL 949938 at *8 (finding that "the positive alert of a certified drug detection dog may be considered by the court in weighing the totality of the evidence in a civil forfeiture action").

During the search of room 249, the officers located a set of digital scales on the bed, dry cleaning receipts with the name of Alton Rivers, and paperwork showing that Derrick Davis had rented a storage bin in Dothan.  Subsequently, the K-9s walked pass the storage bin, and alerted to the presence of narcotics.

In Room 247, there was a strong odor of marijuana as soon as the officers entered the room.  Davis has not disputed that there

were two large plastic gallon size zip-lock bags on the table that contained marijuana residue.  They also located a digital scale, two boxes of plastic sandwich bags, and a total of $14,000.

It is well settled in the Eleventh Circuit, for the purpose of civil forfeiture actions, that the possession of a large sum of currency is "highly probative of a connection to some illegal activity."  *United States v. $121,000.00 in U.S. Currency*, 999 F.2d 150, 1507 (11th Cir. 1993).  *See* also*, United States v. $26,620.00 in U.S. Currency,* 2006 WL 949938 at *8 (N. D. Ga. 2006) (stating that "a large amount of money found in close proximity to drugs or drug paraphernalia is evidence of drug trafficking.").  In *United States v. $22,991.00, More or Less, in U.S. Currency*, 227 F.Supp. 2d 1220, 1231 & n. 3 (S.D. Ala. 2002), the district court held that there is no requirement that the Government tender direct evidence of a connection between the subject property and the offense; the presentation of circumstantial evidence is a permissible form of proof.  Indeed, "the United States is not required to connect the defendant currency to any particular drug transaction" and " the evidence does not have to tie the currency to drugs to the exclusion of all other theories."  *United States v. $33,836 in U.S. Currency,* 899 F.Supp. 574, 577 n.5 (M.D. Ala. 1995).  The government submits that the facts of this case presents the existence of a

9

substantial connection between the defendant currency and a drug trafficking offense.

**C.    Davis had not established a genuine issue of material fact as to a legitimate source for the defendant currency.**

Davis has presented only a possibility that the seized money is from an innocent source. *See $33,868.00 in U.S. Currency*, 899 F.Supp. at 577 (noting "that the presentation of an innocent source cannot vitiate the United States' showing that the source of the currency is illegal activity and more importantly, such a possibility does not constitute a preponderance of the evidence"). First, Davis presented an uncertified copy of a loan agreement he purportedly acquired on November 27, 2006, to pay off small bills. (Claimant Motion Summary Judgment, Ex. B). During his deposition, Davis could not state how much of the loan amount, $2,306.97 he had spent and how much he still had in his pocket. Davis could not recall when he actually cashed the loan check, but stated that it could have been two weeks after he received the loan, which supposedly would have been sometime in early December, 2006. (Exhibit B, p. 30). Conveniently, Davis did not attach a copy of the actual loan check that he cashed. Davis also submitted three checks drawn on "Untouchable Entertainment, LLC D/B/A Club Rio." Club Rio was operated by Davis and his sister. (Exhibit B, pp. 38-39). (Claimant Motion Summary Judgment, Ex. C). The first check was in the amount of

10

$1,000, with a notation in the memo ledger of "Sept 4," and the year is unknown.  The second check was in the amount of $3,000, with a notation in the memo ledger of "11/21," and the year is unknown.  The third check was in the amount of $1,000, with a notation in the memo ledger "October 2, Derrick Davis, Sept, October Salary."  The amount of the third check is not indicated although Davis, in his deposition testimony, states  that the amount was $1,000.  (Exhibit B, p. 35).  Also, October is crossed out the last time it was written in the memo.  Davis, in his deposition testimony,  states that the three checks were written by his sister, and that he could also write checks. (Exhibit B, pp. 25, 34-37).  Finally, Davis submits that he had just cashed a check from HSBC, which was an advance on his income tax refund. (Claimant Motion Summary Judgment, Ex. D). The check was written on January 18, 2007.  Since Davis did not submit the back copy of the check, there is no evidence establishing that the check was cashed on the same date it was issued.

While Davis contends that he acquired the defendant currency through legal means, his evidence does not support his assertion. It is highly unlikely that Davis would have maintained all of the loan money from November 27, 2006, until January 18, 2007, (past two major holidays, Christmas and New Year's).  Although it would appear that Davis had absolutely no living expenses, he provided testimony during his deposition that he borrowed the money to pay

11

off small bills.[3]  Assuming the Court accepts Davis'
unauthenticated proof of a legitimate source for the defendant
currency, the Court would also have to accept that Davis had
absolutely no living expenses.  The United States submits that
the $5,000 in checks from Club Rio, are unauthenticated and do
not provide evidence sufficient to justify visible income. More
importantly, $5,000 in income for a period of four months is not
substantial income.  "Courts have recognized that a claimant's
lack of a legitimate source of substantial income is probative
evidence that the defendant currency was connected to drug
activity.  *See United States v. Carrell*, 252 F.3d 1193, 1201
(11th Cir. 2001).

     This Circuit has held that "under section 881(a)(6),
legitimate funds are forfeitable when knowingly commingled with
forfeitable funds."  *United States v. One Single Family
Residence,* 933 F.2d 976, 981 (11th Cir. 1991).  Therefore, even
if the advanced tax refund of $4920.05, was a legitimate source
of income, Davis would not be entitled to any of the commingled
money.  The government does not concede that the $4920.05 is from
a legitimate source since there is no evidence of when the check
was actually cashed.

---

          [3]     Davis did not attach his deposition or an affidavit to
support his arguments.

**D.    Davis' Fourth Amendment arguments should not be considered in his motion for summary judgment.**

Davis claims that law enforcement officers should have never stopped his car, and any money seized was not justified.  Davis is attempting to raise a Fourth Amendment argument within his motion for summary judgment.

It is well established that an illegally seized asset can be claimed by the Government in a civil forfeiture proceeding.  *See, United States v. $144,600, U.S. Currency*, 757 F.Supp. 1342, 1345 (M.D.Fla. 1991) ("[T]he fact that property was seized in violation of the Fourth Amendment will not immunize it from forfeiture.").  Moreover, this Court "need not address the legality of the search and seizure at issue in this case because even if the currency was illegally seized, the proper remedy would be suppression of the currency as evidence, not a dismissal of the forfeiture action."  *United States v. $172,760.00 In United States Funds*, 2007 WL 4224932, *2 (M.D. Ga. 2007). Therefore, Davis' challenge to the actual stop should have been raised in a motion to suppress.

## Conclusion

In sum, the United States contends in viewing the evidence in a light most favorable to the nonmoving party, Davis has not met his burden of negating the nexus element of the United States' forfeiture action.  Davis failed to prove by a

preponderance of the evidence that the defendant currency was from a legitimate source and therefore not subject to forfeiture. Finally, Davis' motion for summary judgment is not a substitute for a motion to suppress, in that, illegally seized assets can be the subject of a civil forfeiture proceeding. Accordingly, Davis' motion for summary judgment should be denied.

Respectfully submitted on this 12th day of February, 2008.

Respectfully submitted,


/s/Tommie Brown Hardwick
TOMMIE BROWN HARDWICK
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax: (334)223-7135
E-mail:
tommie.hardwick@usdoj.gov
ASB4152 W86T

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2008, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Dustin J. Fowler.


/s/ Tommie Brown Hardwick
Tommie Brown Hardwick
Assistant U. S. Attorney

Affidavit

I am Sgt. Andy L. Martin of the Dothan Police Department's Vice Division. I have been employed with the Dothan Police Department for seventeen years. I have been assigned to the narcotics division for five years. I am currently the supervisor over this division.I have received extensive training regarding narcotics trafficking and money laundering techniques.

On 12/08/2005, the Dothan Police Department arrested B/M Rodney Caliste for Trafficking in Cocaine and Possession of Marijuana I. After this arrest, we found that he was a part of a larger Marijuana and Cocaine distribution organization based in Dothan, Alabama. The organization was going by the name of The Untouchables.

We later found out that some of the members of the organization are as follows: B/M Richard Durr, Rodney Caliste, Derrick Davis, Terrance Durr, Chris Britt, Herman Britt, Alton Rivers, and Kionne Johnson.

We then found that a local night club (Club RIO) had opened up and we kept seeing some of these persons at the club on a regular basis. A city utilities check revealed that the utilities were in the name of The Untouchables. We then began to take a closer look at the organization.

On 01/18/2007 at approx. 2130 hrs., Sgt. Jackson (who was the Vice Division Commander at that time) received a telephone call from an anonymous caller in reference to a drug transaction taking place in the rear parking lot of the Holiday Inn Express. The caller advised that the two vehicles involved were a white Chevrolet Suburban and two black males in a tan colored Dodge Magnum with AL tag 4216FW were going to be involved in the transaction. We immediately recognized the Magnum as being the vehicle driven by Derrick Davis.

Inv. Tim Miller and Inv. Ray Arnold were the first units to respond to the motel. When they arrived, they made contact with the Dodge Magnum and the Suburban close to the rear on the north side of the building. They made contact with the occupants of the Magnum and I made contact with the driver of the white Suburban.

The white Suburban was being driven by B/M Rodney Caliste, who I immediately recognized Rodney Caliste from prior dealings. The white Suburban had a very strong odor of fresh marijuana coming from the vehicle. I searched the vehicle, but could not find any drugs. Mr. Caliste had approx. $6500.00 in U.S. Currency in his possession. He was later released with no charges filed.

During my investigation of Mr. Caliste and his vehicle, I observed a pick-up truck in the parking lot in the rear of the motel with it's lights on. I didn't check the truck at that time because of Mr. Davis and his vehicle were being searched at that time.

I then went and spoke with Inv. Arnold in reference to his contact with Derrick Davis. Inv. Arnold advised that he asked Mr. Davis if he had any weapons and he told him that he did. Inv. Arnold then recovered a handgun in the driver's side floorboard of the vehicle. Inv. Arnold advised that while he was recovering the handgun, he could smell the strong odor of Marijuana in the vehicle. Inv. Arnold then patted Mr. Davis down and felt two large bulges in his front pants pockets. Mr. Davis told Inv. Arnold that the large bulges were money that he got back from his income taxes.

Inv. Arnold then searched the vehicle that Davis was driving. He recovered a small piece of suspected marijuana from the floorboard between the driver's seat and the center console. He also recovered a small piece from the passenger side floorboard between the passenger seat and the center console. Inv. Miller found a small bag of suspected marijuana from the right front pants pocket of the passenger (B/M James Simpson). Mr. James Simpson


GOVERNMENT EXHIBIT
A

gave the name of Henry DeJhon Leonard to Inv. Miller when he was arrested. He later gave his actual name of James Simpson and a warrant was indicated out of Florida. Dispatch advised that the State of Florida refused to extradite on the warrant.

Inv. Arnold had another conversation with Derrick Davis in reference to the money found. He told Inv. Arnold that he had approx. $8500.00 in his pocket and that some of it was from Club RIO. Both individuals were then placed under arrest and transported to the city jail.

I then focused my attention on the truck that I had seen earlier in the parking lot with the lights on. I noticed that the truck was still there and the lights were still on and it appeared as though the battery was going down. I walked over to the vehicle and found that it was unoccupied. There was a lot of clothing hanging in the truck that appeared to have been picked up at the dry cleaners. The tags on the clothing had the name of Alton Rivers on them. Off. Brad Cain walked his K-9 partner around the vehicle and it alerted to the presence of narcotics in the vehicle. We then used a door unlocking tool and entered the truck. I recovered a small plastic bag of marijuana from the center console of the truck as well as paperwork where a storage building in Dothan was rented by Derrick Davis. I collected the evidence and sealed the marijuana in an evidence bag.

I also located paperwork in the vehicle that showed the vehicle was rented from Hertz Rentals in Dothan, Alabama. The paperwork showed the vehicle was rented to Derrick W. Davis on 01/10/2007.

I then went to the front desk clerk and advise her of what was going on in the parking lot. I asked her if she could tell me if Rodney Caliste had a room there. She let me look at the room registration and I found that he didn't have a room. I did notice that room #247 was in the name of Kionne Johnson. I also noticed that room #249 was in the name of Alton Johnson. I then asked if I could look at the registration cards for the two rooms. The room card for 249 in the name of Alton Johnson was signed Alton Rivers.

I then had Off. Cain and Off. Watkins walk their K-9 partners down the walkway and see if they alert on any rooms. Both dogs alerted on room 247 and 249.

I then spoke with Judge Mendheim and relayed the circumstances of the case to him. I later met with Judge Mendheim at his residence and he signed the search warrant for the two rooms.

Vice units made entry into both rooms at the same time and found both rooms were unoccupied. I could smell the strong odor of fresh marijuana coming from both rooms as soon as the doors were opened. During the search of room 247, I recovered two gallon sized zip-lock bags with a small amount of marijuana residue. I also recovered a set of digital scales and two boxes of sandwich bags. I also recovered approx. $14000.00 from the closet .

During the search of room 249, I recovered the following property: one set of digital scales, dry cleaning receipts with the name of Alton Rivers, and some paperwork where Derrick Davis had rented a storage building in Dothan.

I then collected the evidence and requested some officers to go to the storage building and standby. I made contact with Off. Cain and Off. Watkins and had them respond as well. Both K-9's were used and both alerted on the storage building.

I then met with Judge Mendheim and he signed a search warrant for the storage building. A search of the storage building didn't produce any evidence.

Sgt. Andy L. Martin
Dothan Police Department
D.E.A. Task Force
Affiant

Sworn to before me and
Subscribed in my presence
This the 12th day of February 2008.

6·28·08

City of Dothan Municipal Court Magistrate

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5     CIVIL ACTION NUMBER

6     2:07CV687-MEF

7

8     UNITED STATES OF AMERICA,

9          Plaintiff,

10    vs.

11    APPROXIMATELY TWELVE THOUSAND
      DOLLARS ($12,000) IN UNITED
12    STATES CURRENCY,

13         Defendant.

14    _____

15

16              DEPOSITION OF DERRICK DAVIS

17              Date:  November 1, 2007

18                   Time: 2 p.m.

19

20

21

22    COURT REPORTER:                 *ORIGINAL*

23    APRIL R. BENDINGER, CSR

BENDINGER & ASSOCIATES
334-798-0560

GOVERNMENT
EXHIBIT
B

```
 1              A P P E A R A N C E S

 2

 3   FOR THE DEFENDANT:

 4              Mr. Dustin Fowler

 5              BUNTIN, ETHEREDGE & DOWLING

 6              185 North Oates Street

 7              Dothan, Alabama 36303

 8

 9              Mr. Trant Bullard

10              BULLARD & BULLARD

11              224 West Main Street

12              Dothan, Alabama 36303

13

14

15   FOR THE UNITED STATES:

16              Mr. John Harmon

17              ASSISTANT UNITED STATES ATTORNEY

18              131 Clayton Street

19              Montgomery, Alabama 36101

20

21

22

23
```

1                    EXAMINATION INDEX

2    DERRICK DAVIS

3         BY MR. HARMON . . . . . . . . . .    6

4         BY MR. FOWLER . . . . . . . . . .   46

5         BY MR. HARMON . . . . . . . . . .   49

6


7

                     EXHIBIT INDEX
8
                                                MAR
9    Defendant's

10        1     Loan Agreement                   47

11        2     Check                            47

12        3     Check                            48

13        4     Check                            48

14        5     HSBC Check                       49

15

16

17

18

19

20

21

22

23

```
 1                  S T I P U L A T I O N

 2               IT IS STIPULATED AND AGREED by and

 3      between the parties through their respective

 4      counsel that the deposition of DERRICK DAVIS may

 5      be taken before April R. Bendinger, Notary

 6      Public, State at Large, at the United States

 7      Federal Courthouse in Dothan, Alabama on

 8      November 1, 2007, commencing at approximately

 9      2 p.m.

10               IT IS FURTHER STIPULATED AND

11      AGREED that the signature to and the reading of

12      the deposition by the witness is waived, the

13      deposition to have the same force and effect as

14      if full compliance had been had with all laws

15      and rules of Court relating to the taking of

16      depositions.

17               IT IS FURTHER STIPULATED AND

18      AGREED that it shall not be necessary for any

19      objections to be made by counsel to any

20      questions, except as to form or leading

21      questions and that counsel for the parties may

22      make objections and assign grounds at the time

23      of trial or at the time said depositions is
```

1    offered in evidence, or prior thereto.

2              I, April R. Bendinger, a Court

3    Reporter of Dothan, Alabama, and a Notary Public

4    for the State of Alabama at Large, acting as

5    Commissioner, certify that on this date,

6    pursuant to the Federal Rules of Civil

7    Procedure, and the foregoing stipulation of

8    counsel, there came before me at the United

9    States Federal Courthouse in Dothan, Alabama,

10   commencing at approximately 2 p.m. on November

11   1, 2007, DERRICK DAVIS in the above cause, for

12   oral examination, whereupon the following

13   proceedings were had:

14

15

16

17

18

19

20

21

22

23

```
 1                     DERRICK DAVIS,

 2     being first duly sworn, was examined and

 3     testified as follows:

 4                     EXAMINATION

 5     BY MR. HARMON:

 6          Q.    Would you state your full name,

 7     please, sir.

 8          A.    Derrick Wesley Davis.

 9          Q.    And, Mr. Davis, I am John Harmon,

10     I introduced myself earlier.  I am the assistant

11     district attorney handling this case.  You are

12     the same Derrick Davis who filed a claim in the

13     United States vs. $12,204.00 in United States

14     currency?

15          A.    Uh-huh, (affirmative).

16                MR. BULLARD:  You might want to

17     answer yes or no.  Uh-huh and uh-uh is hard for

18     her to take down.

19          Q.    What is your current address,

20     Mr. Davis?

21          A.    2903 Ellington Street.

22          Q.    In Dothan?

23          A.    Uh-huh, (affirmative).
```

1          Q.     Did the Club Rio have a bank

2     account?

3          A.     Yes, it did.

4          Q.     Were you an authorized signature

5     or authority on that bank account to Club Rio?

6          A.     Yes, sir.

7          Q.     You could write a check on that

8     bank account?

9          A.     Right.

10          Q.     What would you use the Club Rio

11     bank account for?

12          A.     To make deposits, deposit money

13     and buy, like, liquor and buy supplies.

14          Q.     Do you have a bank account now?

15          A.     No, sir.

16          Q.     Have you ever had a bank account

17     in your own name?

18          A.     Yeah, a while ago.  Maybe four or

19     five years ago.

20          Q.     Is Club Rio still open?

21          A.     As of this time, no.

22          Q.     When was it closed?

23          A.     It was closed, I would have to ask

1          A.      Why would I have done that?

2          Q.      Why?

3          A.      I wasn't going to put my personal

4    money with the business money.  I wasn't going

5    to do that.

6          Q.      Anyone else borrowing the money

7    besides yourself?

8          A.      No, sir.

9          Q.      And so you cashed the check right

10   around the date that you got it -- November 27,

11   2006?

12         A.      I might not have -- I may have

13   waited a week or two after that.

14         Q.      Sometime around the first of

15   December?

16         A.      Right.

17         Q.      Did you keep that amount of cash

18   with you until the events of January 18, 2007?

19         A.      Did I keep it?

20         Q.      Yes.

21         A.      I may have kept some of it, maybe

22   for Christmas and stuff like that.  I probably

23   kept some of it.  I wouldn't have spent that

```
 1    was dated September 4, 2006 in the amount of

 2    $1,000.  What business was that advanced that

 3    amount of money to you?

 4         A.    Club Rio.

 5         Q.    Did you essentially write a check

 6    to yourself from the Club Rio account?

 7         A.    No.  The way it worked, my sister

 8    would pay me.  She would write my check.

 9         Q.    And she is the one that wrote the

10    check for $1,000?

11         A.    Right.

12         Q.    What did you do with that check,

13    cash it or deposit it?

14         A.    I cashed it.

15         Q.    Where did you cash it?

16         A.    At Wachovia.

17         Q.    Would it be your testimony that

18    you kept the $1000 with you from September 4,

19    2006 until January 18, 2007?

20         A.    I mean, I may have kept some of

21    it.  I don't know.

22         Q.    Do you believe, as you recall, did

23    you spend any of that $1,000 during that period
```

1    from September 4, 2006 to January 18, 2007?

2         A.    Yeah, I may have spent a little

3    bit.

4         Q.    There's also a check, and I think

5    it's dated October 2, 2006.  And I believe,

6    based upon representations that your attorney

7    made to me earlier, and you have a different

8    recollection, you certainly state that, although

9    the amount of the check is not written out, you

10   told your attorney it's for $1,000.  Do you

11   recall that check?

12        A.    The one that doesn't have the

13   amount written on there?

14        Q.    Yes, that's correct.

15        A.    Yes, I recall that.

16        Q.    Was it exactly for $1,000?

17        A.    Uh-huh, (affirmative).

18        Q.    October 2, 2006, is the correct

19   date when you got that check?

20        A.    Right.

21        Q.    Who wrote that check to you?

22        A.    My sister.

23        Q.    Did you, in turn, on that $1000,

```
 1   what did you do with it?  Did you deposit the
 2   check or cash the check?
 3        A.    I cashed it.
 4        Q.    Did you keep the $1000 with you
 5   from October 2006 to January 2007?
 6        A.    Yeah.  I started saving money.  I
 7   wanted to buy a car, so I started saving money.
 8        Q.    You say you were saving?  Where do
 9   you keep the money while it was in your
10   possession?
11        A.    I would keep it on my person, like
12   with me.
13        Q.    At all times?
14        A.    Yeah.
15        Q.    Now, the last one I see, and again
16   this was a Club Rio check?
17        A.    Right.
18        Q.    Last one I see is November 21,
19   2006 check in the amount of $3,000?
20        A.    Yes.
21        Q.    Is that a Club Rio check?
22        A.    It was.
23        Q.    Was it written by your sister?
```

1          A.     Right.

2          Q.     What did you do with that check?

3    Cash it or deposit it?

4          A.     I cashed it.

5          Q.     Did you keep that money with you

6    until January, 2007?

7          A.     Uh-huh, (affirmative).

8          Q.     All three of these checks were

9    issued to you for what cause?  What did you do

10   to obtain them?

11         A.     I worked.  I was part owner of the

12   business.

13         Q.     Was this, for example, money paid

14   to you for your efforts in the furtherance of

15   the business?

16         A.     Right.

17         Q.     Now, the amount of money that was

18   seized was, I believe, $12,204?

19              MR. FOWLER:  One of those somebody

20   said 14, the Department of Justice.

21              MR. BULLARD:  They had those

22   wrong.  They finally came back and said -- can

23   we go off the record?

```
1                    2:32 p.m.

2                    (Off the record)

3                    2:34 p.m.

4    BY MR. HARMON:

5         Q.    Okay.  Mr. Davis, you heard what

6    your attorney just said about the other source

7    of the money.  I think you indicated to me

8    earlier, you were not working anywhere but Club

9    Rio during this period?

10        A.    Right.

11        Q.    Other than the loan from First

12   Franklin, the tax advance loan from HSBC, and

13   the three checks that I just discussed, where

14   did any other money you had during that period

15   come from?

16        A.    All the money came from the club

17   itself.  The club, it's a cash business, you

18   know.  We dealt with cash.  You know, so you

19   know, I would do stuff like go to the bank, get

20   money stuff like that.  It was a cash business,

21   so that when he's saying on the night like a

22   good night we take the cash ourselves, and we

23   count it.  We count it, we deposit like --
```

1    because it's our business.  I guess you could

2    say it was a family business, because it was our

3    business, me and my sister.  So all the money

4    that I got from the business, it didn't you

5    know, get paid as a check, not all of it.  You

6    know what I'm saying?  We decided we pay.  She

7    decided she would pay me for my services.

8         Q.     When you got that money, would you

9    get it cashed on the night it was earned?

10        A.     Right.  We deposit the rest.

11        Q.     Did she give you a receipt for it,

12   or you give her any receipt that you had

13   obtained this money, any type of written

14   documentation or receipt?

15        A.     No.

16        Q.     For the purposes of profit and

17   loss for taxation, how did you keep up with the

18   amount of money that was earned?

19        A.     She did that.  I left that up to

20   her.

21        Q.     To your knowledge, were there any

22   state tax returns that were to be filed.  Let me

23   back up and ask about this.  Did you sell liquor