IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA        )
                                )
        PLAINTIFF,              )
                                )
    v.                         )CIVIL ACTION NO. 2:07-cv-687-MEF
                                )
APPROXIMATELY TWELVE THOUSAND )
($12,000) DOLLARS IN UNITED    )
STATES CURRENCY,               )
                                )
        DEFENDANT.             )

BRIEF AND MEMORANDUM OF LAW IN SUPPORT
OF THE UNITED STATES OF AMERICA'S
MOTION FOR SUMMARY JUDMENT

The United States of America ("United States"), by and through
Leura G. Canary, United States Attorney for the Middle District of
Alabama, and Tommie Brown Hardwick, Assistant United States
Attorney, hereby respectfully submits the following Brief and
Memorandum of Law in support of its Motion For Summary Judgment:

I. PRELIMINARY STATEMENT

This action arose out of a stop and search of Derrick Davis on
January 18, 2007, and the seizure of approximately Twelve Thousand
($12,000) Dollars in United States Currency, (hereinafter,
"Defendant currency"), based upon a violation of Title II of the
Controlled Substances Act, 21, U.S.C. § 801 et seq. The Defendant
currency is subject to forfeiture under 21 U.S.C. § 881. The
United States moves for summary judgment because there is no
genuine issue of material fact requiring a trial regarding the
forfeiture of this Defendant currency.

STATEMENT OF THE CASE

A.    Civil Forfeiture Proceedings.

On July 27, 2007, the United States filed a Verified Complaint for forfeiture in rem in the United States District Court for the Middle District of Alabama.

B.    Facts.

The United States adopts and alleges the facts as found in the Verified Complaint, Paragraphs 5(a) through 5(k), incorporating the sworn affidavit of Sgt. Andy L. Martin, Dothan Police Department Drug Enforcement Administration Task Force ("D.E.A"). The facts contained in the Verified Complaint are sworn to and verified and the original Verification is filed with this Court. The affidavit of Sgt. Andy L. Martin is filed with this Court in the United States' Response To Claimant's Motion For Summary Judgment, attached as Government Exhibit A.

The composite facts.

(a)    In December, 2005, the Dothan Police Department ("DPD")made an arrest of Rodney Caliste[1] for Trafficking in Cocaine and Possession of Marijuana First Degree. (Exhibit A, Affidavit of Sgt. Andy L. Martin). As a result of Caliste's arrest, the DPD learned of a drug organization going by the name of "The

---

[1]    According to the court records in Houston County, Rodney Caliste was convicted in the Circuit Court of Houston County, Alabama, under Case No. CC-06-129 (consolidated with Case No. CC-06-128), for Possession of Marijuana First and Trafficking in Cocaine.

2

Untouchables." *Id.*   The Untouchables' membership included, among others, Derrick Davis, Alton Rivers and Kionne Johnson.   *Id.* Members of The Untouchables were seen frequenting a relatively new local night club named "Club Rio."  The DPD began targeting certain members of Club Rio who were also associated with the Untouchables. (Exhibit A, p. 1).

(b)  The Drug Enforcement Administration ("DEA") identified Davis as being involved in cocaine and marijuana trafficking.  Moreover, Davis had been previously arrested by the Houston County Sheriff's Office for Marijuana Possession First Degree and placed on pre-trial diversion.

(c)  On January 18, 2007, the DPD responded to the rear parking lot of the Holiday Inn Express, located at 3071 Ross Clark Circle, Dothan, Alabama, in reference to reported drug activities. (Verified Complaint)[2].  The information provided to the DPD was that a black male in a white Chevrolet Suburban and two black males in a tan Dodge Magnum were involved in a drug transaction in the parking lot. *Id.*

(d)  Upon arrival, detectives did observe two black males in a Dodge Magnum, with Derrick Wesley Davis ("Davis") located in the driver's seat.  (Verified Complaint).  Detectives could smell a strong odor of raw marijuana when they approached the car, and

_____

[2]    The facts are taken from the Verified Complaint unless otherwise designated.

3

they also observed a handgun on the driver's floor board. When asked if he had any weapons, Davis acknowledged that his handgun was on the floorboard of the driver's seat. Davis stated that he had a permit for the handgun, although no permit was located at the scene. Detectives searched the vehicle and found residue of marijuana. During a pat down of Davis, the detectives felt a large bulge in both of Davis' pants pockets. The bulges turned out to be U.S. currency. Davis claimed the defendant currency was proceeds of his income tax return. *Id.* Davis later stated that he had approximately $8,500, and some of the money was from Club Rio. (Exhibit A, p. 2) Davis was arrested on drugs and weapon charges.

(e) Inv. Tim Miller found a small bag of marijuana in the front pocket of the passenger, James Simpson.[3] (Exhibit A, p. 1-2).

(f) The investigation led the detectives to rooms 247 and 249 of the Holiday Inn Express, where the detectives used a canine ("K-9") to sniff the doors of the two rooms. The canine was trained to detect the presence of controlled substances. The canine alerted to the presence of a controlled substance, or the by-products, chemicals or substances associated with drug production, in both rooms. Based upon the K-9 alert, detectives secured a search warrant for the rooms.

---

[3] Simpson initially told Inv. Miller that his name was Henry DeJohn.

(g)   Upon entering Room 247, officers detected a strong odor of marijuana.  A search of the room yielded two large plastic gallon-size bags containing marijuana residue, a set of digital scales, two boxes of plastic sandwich baggies, and three stacks of U.S. currency totaling approximately $14,000 which was seized as drug proceeds. The currency was packaged in two $5,000 stacks,  and one stack of currency which totaled $4,000.   Room 247 was registered to Kionne Edward Johnson, a person known to the detectives to be a drug trafficker in the Dothan area, and a criminal associate of Davis.

(h)   Like room 247, officers executing the warrant for room 249, detected a strong odor of raw marijuana.   While no marijuana or U.S. currency was found in room 249, a set of digital scales and miscellaneous paperwork were discovered.  Room 249 was registered to Alton Rivers.   Rivers was also known as a drug trafficker in the Dothan area, and a criminal associate of Davis.

(i)   The United States submits that there are additional facts that cannot be disputed by the claimant that provide a nexus between the defendant currency and criminal activity.  (Exhibit A, p. 2).  Within the paperwork taken from room 249 were documents showing that Derrick Davis rented a storage bin in Dothan, Alabama. *Id.* As officers walked two K-9s near the storage bin the two K-9s alerted to the presence of a controlled substance. *Id.* Based upon

this information, a search warrant was secured and executed at the storage bin. *Id.* Although there was a strong odor of raw marijuana in the storage bin, no drugs were located. *Id.*

(j) During the investigation at the Holiday Inn Express, Officers observed a pick-up truck parked in the rear parking lot of the Holiday Inn Express. (Exhibit A, p. 2). The pick-up truck was a rental truck from Hertz. Inside the pick-up truck was clothing from a cleaners bearing the name Alton Rivers and a small bag of marijuana. *Id.* It was later learned that the pick-up truck had been rented by Derrick Davis on January 10, 2007. *Id.* At the time of Davis' arrest, he was driving his girlfriend's car.

C.    Deposition of Derrick Davis.

The United States specifically cites the following portions of Derick Davis' deposition in support of summary judgment.

1.    Page 8: Derrick Davis was last employed during the time he ran Club Rio, which opened in August, 2006 and ended in January 2007. The club was Davis' only employment during that time.

2.    Pages 10-11: Derrick Davis was arrested again after the January 18, 2007 seizure. The arrest took place on August 18 or 19, 2007, on a charge of possession of cocaine in Dothan.

3.    Page 13: Davis had a previous arrest for possession of marijuana, and was granted pretrial diversion.

4.  <u>Pages 16-17</u>: James Simpson was the passenger in the car with Derrick Davis on January 18, 2007, and his girlfriend, Deanna Cobb, owned the car. Davis and Cobb have a child together.

5.  <u>Pages 18, 21</u>: Davis stated that he had a firearm with him at the Holiday Inn Express and for "no particular reason" the firearm "just rides in the car with [him]." Davis did not have a permit with him on January 18, 2007.

6.  <u>Page 19</u>: Davis stated that he had not rented a room at the Holiday Inn Express; that he did not know any one who had rented a room at the Holiday Inn Express; and that he did not go up to a room on the night he was arrested.

7.  <u>Pages 24</u>: Davis stated that his sources for the Defendant currency were his income tax and income from the Club he ran.

8.  <u>Page 25-26</u>: Davis was authorized to write checks on the Club Rio bank account and he could make deposits, deposit money and buy supplies. Club Rio closed the second week in January.

9.  <u>Page 27-28</u>: Davis knows Alton Rivers and [Keyone] Edward Johnson because they went to school together and hung out together. Davis says he did not see Rivers or Johnson at the Holiday Inn Express on January 18, 2007, and he did not know that they had rented a room there.

10.  <u>Page 28</u>: Davis borrowed $2,306.97 on 11/27/06, to pay off "small bills and stuff."

7

11.  Pages 29-30: Davis stated that he cashed the loan check because he "needed the money." Davis may have waited a week or two to cash the check. Davis may have kept some of the money for Christmas.

12.  Pages 31-33: Davis went to HSBC to get a loan based upon his expected income tax and was handed a "check" which he cashed at "Chandlers." Chandlers charged Davis about $100 to cash the check. Davis says he had not had a chance to spend any of the money.

13.  Pages 34-35: Davis presented a copy of a $1000 check from Club Rio written on September 4, [2006]. Davis may have kept some of it from September 4, 2006, until January 18, 2007.

14.  Pages 35-36: Davis presented a check written on October 2, [2006], with no amount written on it. Davis says the check was for $1000 exactly. Davis kept the $1000 because he had started to save.

15.  Pages 36-37: On November 21, [2006], Davis received a check in the amount of $3,000 from Club Rio. The checks were all written by Davis' sister. Davis also cashed this check and kept the money from November 21, [2006], until January 18, 2007.

16.  Pages 39-40: Davis cashed the checks on the night they were earned. There are no receipts for profits and loss for taxation. Davis sister kept up with the amount of money earned.

17. <u>Pages 40-41</u>: Davis' sister kept the accounts, taxes, checking account. Davis and his sister were the incorporators of Club Rio.

18. <u>Page 42-44</u>: Davis filed a personal tax form with the federal government. Davis said the "tax people, the people that do my taxes" have a copy of the tax return. Davis did not recall the name of the tax company. He recalled that it was located on West Main. The same company prepared Davis' state income taxes.

19. <u>Page 47</u>: The complete name of the club was "Untouchable Entertainment, LLC d/b/a/ Club Rio."

<u>ARGUMENT</u>

SUMMARY JUDGMENT SHOULD BE GRANTED
BECAUSE THERE IS NO GENUINE ISSUE OF
MATERIAL FACT REQUIRING A TRIAL

A. <u>The Standard for Granting Summary Judgment</u>.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court should render summary judgment if it concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of establishing "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986) (quoting Rule 56(c)).  The "mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-8, 106 S.Ct. 2505, 2510 (1986) (emphasis in original);  <u>See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 1355-56 (1986).  Summary judgment is appropriate in civil forfeitures where this standard is met. <u>See</u>, <u>e.g.</u>, <u>United States v. One 1987 Mercedes Benz 300E</u>, 820 F. Supp. 248 (E.D.Va. 1993) (granting summary judgment to government where there was no material issue of fact).

Whether there is a genuine issue of fact for trial depends on the substantive law of the underlying case and the evidentiary burdens that law places on each party.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 252-56 (noting that "the judge must view the evidence presented through the prism of the substantive evidentiary burden"); <u>United States v. One Parcel of Real Property</u>, 904 F.2d 487, 490 (9th Cir. 1990); <u>Richards v. Neilsen Freight Lines</u>, 810 F.2d 898, 902 (9th Cir. 1987).  Thus, in the instant case, the summary judgment rules must be "'construed in the light of the statutory law of forfeitures, and particularly the procedural requirements set forth therein.'" <u>United States v. One</u>

56-Foot Motor Yacht Named Tahuna, 702 F.2d 1276, 1281 (9th Cir. 1983) (quoting United States v. One 1975 Mercedes 280S, 590 F.2d 196, 199 (6th Cir.1978)).

The Court of Appeals for the Eleventh Circuit noted as follows:

> Under Fed.R.Civ.P 56(c), a district court should award summary judgment to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case identifies which facts are material. A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."
>
> *    *    *    *    *
>
> The moving party bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." When the nonmoving party has the burden of proof at trial, the moving party is not required to "support its motion with affidavits or other similar material negating the opponent's claim," in order to discharge this "initial responsibility." Instead, the moving party simply may "`show[]'-- that is, point[] out to the district court -- that there is a absence of evidence to support the nonmoving party's case." Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. If the moving party shows the absence of a

11

triable issue of fact by either method, the burden
on summary judgment shifts to the nonmoving party,
who must show that a genuine issue remains for
trial.  If the nonmoving party fails to "make a
sufficient showing on an essential element of her
case with respect to which she has the burden of
proof," the moving party is entitled to summary
judgment.  (Cites omitted).

United States v. Four Parcels of Real Property, 941 F.2d 1428,
1437-1438 (11th Cir. 1991).

    B.   Burden of Proof.

Title 18, United States Code, Section 983 requires the

United States to establish, by a preponderance, that the Defendant

property is forfeitable.

    C.   The Evidence Establishes That The Defendant Currency Is
        Forfeitable.

In determining whether property is forfeitable, the

United States is entitled to rely on evidence gathered after the

Complaint was filed. Title 18, United States Code, Section

983(c)(2) ("the Government may use evidence gathered after the

filing of a complaint for forfeiture to establish, by a

preponderance of the evidence, that property is subject to

forfeiture").

The facts as set forth in the statement of the case

clearly establish that the Defendant currency is subject to

forfeiture.  Claimant cannot prove to the district court that

defendant currency is not subject to forfeiture as proceeds

traceable to a controlled substance offense.  Although Davis

12

attempts to offer evidence that the Defendant currency has no nexus to criminal activity, his evidence is unauthenticated and unreliable. Davis' exhibits amount to mere conclusory statements that there is no nexus between the defendant currency and drug related activities. See (Claimant's Motion, Doc. 13. p. 4). The Eleventh Circuit has "'consistently held that conclusory allegations without specific supporting facts have no probative value.'" Leigh v. Warner Bros., Inc., 212 F.3d. 1210, 1217 (11th Cir. 2000) (quoting Evers v. General Motors Corp., 770 F.2d 984, 985 (11th Cir. 1985)).

Pursuant to 21 U.S.C. § 881(a)(6),

"[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [subchapter 13], all proceeds traceable to such an exchange, and all money, negotiable instruments, and securities used or intended to be used to facilitate any violation of [subchapter 13]." Property subject to forfeiture includes all moneys given or intended to be given in exchange for illegal drugs, the proceeds of such an exchange, and all moneys used or intended to be used to facilitate a violation of the drug laws."

Drawing all reasonable inferences from the Verified Complaint and viewing the evidence in the light most favorable to the nonmoving party, United States' motion for summary judgment should be granted. There are several facts that support a finding, by a preponderance of the evidence, that Davis was involved in criminal activity. First, Davis was driving his girlfriend's car at the time of his arrest. Law enforcement officers noticed a pick-up

truck with its lights on in the parking lot of the Holiday Inn Express near Rooms 247 and 249. Inside the truck, in plain view, officers noticed a large amount of dry cleaning with the name Alton Rivers on them.  Cpl. Brad Cain walked his K-9 around the vehicle and the K-9 alerted to the presence of narcotics in the truck.  The K-9 was also walked past Rooms 247 and 249, and alerted to the presence of narcotics in both rooms. As a result of the K-9 alert, search warrants were acquired and executed on both rooms. *See* *$26,620.00 in U.S. Currency*, 2006 WL 949938 at *8 (finding that "the positive alert of a certified drug detection dog may be considered by the court in weighing the totality of the evidence in a civil forfeiture action").

During the search of room 249, the officers located a set of digital scales on the bed, dry cleaning receipts with the name of Alton Rivers, and paperwork showing that Derrick Davis had rented a storage bin in Dothan.  Subsequently, the K-9s walked past the storage bin, and alerted to the presence of narcotics.

In Room 247, there was a strong odor of marijuana as soon as the officers entered the room.  Davis cannot disputed that there were two large plastic gallon size zip-lock bags on the table that contained marijuana residue.  Officers also located a digital scale, two boxes of plastic sandwich bags, and a total of $14,000.

It is well settled in the Eleventh Circuit, for the purpose of civil forfeiture actions, that the possession of a large sum of

14

currency is "highly probative of a connection to some illegal activity." United States v. $121,000.00 in U.S. Currency, 999 F.2d 150, 1507 (11th Cir. 1993). See also, United States v. $26,620.00 in U.S. Currency, 2006 WL 949938 at *8 (N. D. Ga. 2006) (stating that "a large amount of money found in close proximity to drugs or drug paraphernalia is evidence of drug trafficking."). In United States v. $22,991.00, More or Less, in U.S. Currency, 227 F.Supp. 2d 1220, 1231 & n. 3 (S.D. Ala. 2002), the district court held that there is no requirement that the Government tender direct evidence of a connection between the subject property and the offense; the presentation of circumstantial evidence is a permissible form of proof. Indeed, "the United States is not required to connect the defendant currency to any particular drug transaction" and " the evidence does not have to tie the currency to drugs to the exclusion of all other theories." United States v. $33,836 in U.S. Currency, 899 F.Supp. 574, 577 n.5 (M.D. Ala. 1995). The United States submits that the facts of this case present the existence of a substantial connection between the defendant currency and a drug trafficking offense.

D.    Davis Has Not Established A Genuine Issue Of Material Fact As To A Legitimate Source For The Defendant Currency.

Davis has presented only a possibility that the seized money is from an innocent source. See $33,868.00 in U.S. Currency, 899 F.Supp. at 577 (noting "that the presentation of an innocent

15

source cannot vitiate the United States' showing that the source of
the currency is illegal activity and more importantly, such a
possibility does not constitute a preponderance of the evidence").
First, during deposition Davis presented an uncertified copy of a
loan agreement he purportedly acquired on November 27, 2006, to pay
off small bills. (Claimant Motion Summary Judgment, Ex. B). During
his deposition, Davis could not state how much of the loan amount,
$2,306.97 he had spent and how much he still had in his pocket.
Davis could not recall when he actually cashed the loan check, but
stated that it could have been two weeks after he received the
loan, which supposedly would have been some time in early December,
2006. (Exhibit B, p. 30).  Conveniently, Davis did not attach a
copy of the actual loan check that he cashed.  Davis also submitted
three checks drawn on "Untouchable Entertainment, LLC D/B/A Club
Rio."  Club Rio was operated by Davis and his sister. (Exhibit B,
pp. 38-39).  (Claimant Motion Summary Judgment, Ex. C).  The first
check was in the amount of $1,000, with a notation in the memo
ledger of "Sept 4," and the year is unknown.  The second check was
in the amount of $3,000, with a notation in the memo ledger of
"11/21," and the year is unknown.  The third check was in the
amount of $1,000, with a notation in the memo ledger "October 2,
Derrick Davis, Sept, October Salary."  The amount of the third
check is not indicated although Davis, in his deposition testimony,
states  that the amount was $1,000.  (Exhibit B, p. 35).   Also,

October is crossed out the last time it was written in the memo. Davis, in his deposition testimony, states that the three checks were written by his sister, and that he could also write checks. (Exhibit B, pp. 25, 34-37). Finally, Davis submits that he had just cashed a check from HSBC, which was an advance on his income tax refund. (Claimant Motion Summary Judgment, Ex. D). The check was written on January 18, 2007. Since Davis did not submit the back copy of the check, there is no evidence establishing that the check was cashed on the same date it was issued.

While Davis contends that he acquired the defendant currency through legal means, his evidence does not support his assertion. It is highly unlikely that Davis would have maintained all of the loan money from November 27, 2006, until January 18, 2007, (past two major holidays, Christmas and New Year's). Although it would appear that Davis had absolutely no living expenses, he provided testimony during his deposition that he borrowed the money to pay off small bills.[4] Assuming the Court accepts Davis' unauthenticated proof of a legitimate source for the defendant currency, the Court would also have to accept that Davis had absolutely no living expenses. The United States submits that the $5,000 in checks from Club Rio, are unauthenticated and do not provide evidence sufficient to justify visible income. More

---

[4] Davis did not attach his deposition or an affidavit to support his arguments.

17

importantly, $5,000 in income for a period of four months is not substantial income. "Courts have recognized that a claimant's lack of a legitimate source of substantial income is probative evidence that the defendant currency was connected to drug activity. See United States v. Carrell, 252 F.3d 1193, 1201 (11th Cir. 2001).

This Circuit has held that "under section 881(a)(6), legitimate funds are forfeitable when knowingly commingled with forfeitable funds." United States v. One Single Family Residence, 933 F.2d 976, 981 (11th Cir. 1991). Therefore, even if the advanced tax refund of $4920.05, was a legitimate source of income, Davis would not be entitled to any of the commingled money. The government does not concede that the $4920.05 is from a legitimate source since there is no evidence of when the check was actually cashed.

E.  No Requirement To Trace The Defendant Currency To A Specific Offense.

In a civil forfeiture case based upon drug trafficking, the United States does not have to trace a relationship between the property and a particular drug transaction. See United States v. $242,484.00, 389 F.3d 1149, 1160 (11th Cir. 2004)(en banc).

F.  The Verified Complaint And The Affidavit Of St. Andy Martin Show That The Defendant Currency Is Subject To Forfeiture.

The amount of currency seized, Davis' rental truck containing Alton Rivers' clothing, Davis' rental agreement of storage bin located inside the hotel room rented by Alton River and

18

the drug dog alert in all locations, in addition to the $14,000 already seized from a related hotel room provides strong evidence of a substantial connection between illegal drug dealing and the seized currency.  See United States v. $22,991, More or Less in U.S. Currency, 227 F.Supp.2d 1120, 1232-1235 (S.D. Ala. 2002).

### CONCLUSION

For all the reasons stated above, the Court should enter judgment forfeiting the Defendant currency to the United States of America.

Respectfully submitted this 19th day of February 2008.

FOR THE UNITED STATES ATTORNEY
LEURA G. CANARY


/s/Tommie Brown Hardwick
Tommie Brown Hardwick
Assistant United States Attorney
Bar Number: ASB4152 W86T
Office of the United States Attorney
Middle District of Alabama
131 Clayton Street
Post Office Box 197
Montgomery, Alabama 36101-0197
Telephone:(334) 223-7280
Facsimile:(334) 223-7560

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Dustin J. Fowler.**


/s/Tommie Brown Hardwick
Tommie Brown Hardwick
Assistant United States Attorney

20

Affidavit

I am Sgt. Andy L. Martin of the Dothan Police Department's Vice Division.  I have been employed with the Dothan Police Department for seventeen years.  I have been assigned to the narcotics division for five years.  I am currently the supervisor over this division.I have received extensive training regarding narcotics trafficking and money laundering techniques.

On 12/08/2005, the Dothan Police Department arrested B/M Rodney Caliste for Trafficking in Cocaine and Possession of Marijuana I.  After this arrest, we found that he was a part of a larger Marijuana and Cocaine distribution organization based in Dothan, Alabama.  The organization was going by the name of The Untouchables.

We later found out that some of the members of the organization are as follows:  B/M Richard Durr, Rodney Caliste, Derrick Davis, Terrance Durr, Chris Britt, Herman Britt, Alton Rivers, and Kionne Johnson.

We then found that a local night club (Club RIO) had opened up and we kept seeing some of these persons at the club on a regular basis.  A city utilities check revealed that the utilities were in the name of The Untouchables.  We then began to take a closer look at the organization.

On 01/18/2007 at approx. 2130 hrs., Sgt. Jackson (who was the Vice Division Commander at that time) received a telephone call from an anonymous caller in reference to a drug transaction taking place in the rear parking lot of the Holiday Inn Express.  The caller advised that the two vehicles involved were a white Chevrolet Suburban and two black males in a tan colored Dodge Magnum with AL tag 4216FW were going to be involved in the transaction. We immediately recognized the Magnum as being the vehicle driven by Derrick Davis.

Inv. Tim Miller and Inv. Ray Arnold were the first units to respond to the motel.  When they arrived, they made contact with the Dodge Magnum and the Suburban close to the rear on the north side of the building.  They made contact with the occupants of the Magnum and I made contact with the driver of the white Suburban.

The white Suburban was being driven by B/M Rodney Caliste, who I immediately recognized Rodney Caliste from prior dealings.  The white Suburban had a very strong odor of fresh marijuana coming from the vehicle. I searched the vehicle, but could not find any drugs.  Mr. Caliste had approx. $6500.00 in U.S. Currency in his possession.  He was later released with no charges filed.

During my investigation of Mr. Caliste and his vehicle, I observed a pick-up truck in the parking lot in the rear of the motel with it's lights on.  I didn't check the truck at that time because of Mr. Davis and his vehicle were being searched at that time.

I then went and spoke with Inv. Arnold in reference to his contact with Derrick Davis.  Inv. Arnold advised that he asked Mr. Davis if he had any weapons and he told him that he did.  Inv. Arnold then recovered a handgun in the driver's side floorboard of the vehicle.  Inv. Arnold advised that while he was recovering the handgun, he could smell the strong odor of Marijuana in the vehicle.  Inv. Arnold then patted Mr. Davis down and felt two large bulges in his front pants pockets.  Mr. Davis told Inv. Arnold that the large bulges were money that he got back from his income taxes.

Inv. Arnold then searched the vehicle that Davis was driving.  He recovered a small piece of suspected marijuana from the floorboard between the driver's seat and the center console.  He also recovered a small piece from the passenger side floorboard between the passenger seat and the center console.  Inv. Miller found a small bag of suspected marijuana from the right front pants pocket of the passenger (B/M James Simpson).  Mr. James Simpson



GOVERNMENT EXHIBIT
A

gave the name of Henry DeJhon Leonard to Inv. Miller when he was arrested. He later gave his actual name of James Simpson and a warrant was indicated out of Florida. Dispatch advised that the State of Florida refused to extradite on the warrant.

Inv. Arnold had another conversation with Derrick Davis in reference to the money found. He told Inv. Arnold that he had approx. $8500.00 in his pocket and that some of it was from Club RIO. Both individuals were then placed under arrest and transported to the city jail.

I then focused my attention on the truck that I had seen earlier in the parking lot with the lights on. I noticed that the truck was still there and the lights were still on and it appeared as though the battery was going down. I walked over to the vehicle and found that it was unoccupied. There was a lot of clothing hanging in the truck that appeared to have been picked up at the dry cleaners. The tags on the clothing had the name of Alton Rivers on them. Off. Brad Cain walked his K-9 partner around the vehicle and it alerted to the presence of narcotics in the vehicle. We then used a door unlocking tool and entered the truck. I recovered a small plastic bag of marijuana from the center console of the truck as well as paperwork where a storage building in Dothan was rented by Derrick Davis. I collected the evidence and sealed the marijuana in an evidence bag.

I also located paperwork in the vehicle that showed the vehicle was rented from Hertz Rentals in Dothan, Alabama. The paperwork showed the vehicle was rented to Derrick W. Davis on 01/10/2007.

I then went to the front desk clerk and advise her of what was going on in the parking lot. I asked her if she could tell me if Rodney Caliste had a room there. She let me look at the room registration and I found that he didn't have a room. I did notice that room #247 was in the name of Kionne Johnson. I also noticed that room #249 was in the name of Alton Johnson. I then asked if I could look at the registration cards for the two rooms. The room card for 249 in the name of Alton Johnson was signed Alton Rivers.

I then had Off. Cain and Off. Watkins walk their K-9 partners down the walkway and see if they alert on any rooms. Both dogs alerted on room 247 and 249.

I then spoke with Judge Mendheim and relayed the circumstances of the case to him. I later met with Judge Mendheim at his residence and he signed the search warrant for the two rooms.

Vice units made entry into both rooms at the same time and found both rooms were unoccupied. I could smell the strong odor of fresh marijuana coming from both rooms as soon as the doors were opened. During the search of room 247, I recovered two gallon sized zip-lock bags with a small amount of marijuana residue. I also recovered a set of digital scales and two boxes of sandwich bags. I also recovered approx. $14000.00 from the closet .

During the search of room 249, I recovered the following property: one set of digital scales, dry cleaning receipts with the name of Alton Rivers, and some paperwork where Derrick Davis had rented a storage building in Dothan.

I then collected the evidence and requested some officers to go to the storage building and standby. I made contact with Off. Cain and Off. Watkins and had them respond as well. Both K-9's were used and both alerted on the storage building.

I then met with Judge Mendheim and he signed a search warrant for the storage building. A search of the storage building didn't produce any evidence.

Sgt. Andy L. Martin
Dothan Police Department
D.E.A. Task Force
Affiant

Sworn to before me and
Subscribed in my presence
This the 12th day of February 2008.

6·28·08

City of Dothan Municipal Court Magistrate

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE MIDDLE DISTRICT OF ALABAMA

 3                    NORTHERN DIVISION

 4

 5     CIVIL ACTION NUMBER

 6     2:07CV687-MEF

 7

 8     UNITED STATES OF AMERICA,

 9          Plaintiff,

10     vs.

11     APPROXIMATELY TWELVE THOUSAND
       DOLLARS ($12,000) IN UNITED
12     STATES CURRENCY,

13          Defendant.

14     _____

15

16            DEPOSITION OF DERRICK DAVIS

17              Date:  November 1, 2007

18                  Time: 2 p.m.

19

20

21

22     COURT REPORTER:

23     APRIL R. BENDINGER, CSR
```

GOVERNMENT
EXHIBIT
B

**BENDINGER & ASSOCIATES**
**334-798-0560**

```
 1              A P P E A R A N C E S

 2

 3    FOR THE DEFENDANT:

 4              Mr. Dustin Fowler

 5              BUNTIN, ETHEREDGE & DOWLING

 6              185 North Oates Street

 7              Dothan, Alabama 36303

 8

 9              Mr. Trant Bullard

10              BULLARD & BULLARD

11              224 West Main Street

12              Dothan, Alabama 36303

13

14

15    FOR THE UNITED STATES:

16              Mr. John Harmon

17              ASSISTANT UNITED STATES ATTORNEY

18              131 Clayton Street

19              Montgomery, Alabama 36101

20

21

22

23
```

1                    EXAMINATION INDEX

2    DERRICK DAVIS

3        BY MR. HARMON . . . . . . . . . .    6

4        BY MR. FOWLER . . . . . . . . . .   46

5        BY MR. HARMON . . . . . . . . . .   49

6

7

                          EXHIBIT INDEX

8
                                                    MAR
9    Defendant's

10    1    Loan Agreement                        47

11    2    Check                                 47

12    3    Check                                 48

13    4    Check                                 48

14    5    HSBC Check                            49

15

16

17

18

19

20

21

22

23

1            S T I P U L A T I O N

2            IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the deposition of DERRICK DAVIS may

5    be taken before April R. Bendinger, Notary

6    Public, State at Large, at the United States

7    Federal Courthouse in Dothan, Alabama on

8    November 1, 2007, commencing at approximately

9    2 p.m.

10           IT IS FURTHER STIPULATED AND

11   AGREED that the signature to and the reading of

12   the deposition by the witness is waived, the

13   deposition to have the same force and effect as

14   if full compliance had been had with all laws

15   and rules of Court relating to the taking of

16   depositions.

17           IT IS FURTHER STIPULATED AND

18   AGREED that it shall not be necessary for any

19   objections to be made by counsel to any

20   questions, except as to form or leading

21   questions and that counsel for the parties may

22   make objections and assign grounds at the time

23   of trial or at the time said depositions is

```
 1    offered in evidence, or prior thereto.

 2                    I, April R. Bendinger, a Court

 3    Reporter of Dothan, Alabama, and a Notary Public

 4    for the State of Alabama at Large, acting as

 5    Commissioner, certify that on this date,

 6    pursuant to the Federal Rules of Civil

 7    Procedure, and the foregoing stipulation of

 8    counsel, there came before me at the United

 9    States Federal Courthouse in Dothan, Alabama,

10    commencing at approximately 2 p.m. on November

11    1, 2007, DERRICK DAVIS in the above cause, for

12    oral examination, whereupon the following

13    proceedings were had:

14

15

16

17

18

19

20

21

22

23
```

```
 1                        DERRICK DAVIS,
 2      being first duly sworn, was examined and
 3      testified as follows:
 4                        EXAMINATION
 5      BY MR. HARMON:
 6           Q.    Would you state your full name,
 7      please, sir.
 8           A.    Derrick Wesley Davis.
 9           Q.    And, Mr. Davis, I am John Harmon,
10      I introduced myself earlier.  I am the assistant
11      district attorney handling this case.  You are
12      the same Derrick Davis who filed a claim in the
13      United States vs. $12,204.00 in United States
14      currency?
15           A.    Uh-huh, (affirmative).
16                 MR. BULLARD:  You might want to
17      answer yes or no.  Uh-huh and uh-uh is hard for
18      her to take down.
19           Q.    What is your current address,
20      Mr. Davis?
21           A.    2903 Ellington Street.
22           Q.    In Dothan?
23           A.    Uh-huh, (affirmative).
```

```
 1          Q.     Was that your address back in
 2   January 2007?
 3          A.     No, sir.
 4          Q.     Where were you living then?
 5          A.     Highland Trails Apartments.
 6          Q.     Highland Trails?
 7          A.     Highland Trails Apartments.
 8          Q.     What apartment number?
 9          A.     75.
10          Q.     What's your date of birth,
11   Mr. Davis?
12          A.     10/3/81.
13          Q.     Do you have an Alabama driver's
14   license?
15          A.     Yes, sir.
16          Q.     Do know the number?
17          A.     6709248.
18          Q.     Are you currently employed,
19   Mr. Davis?
20          A.     No, sir.
21          Q.     When is the last time you were
22   working?
23          A.     Last time I was running a
```

```
 1   nightclub, and it ended in January.

 2          Q.    Of this year?

 3          A.    This year.

 4          Q.    What was the name of that

 5   nightclub?

 6          A.    Club Rio.

 7          Q.    How long did you run that club?

 8          A.    It opened in August of '06.  Maybe

 9   six months, maybe six or seven months.

10          Q.    From August 2006 to January of

11   2007?

12          A.    Right.

13          Q.    Was that your only employment

14   during that period?

15          A.    At that time, yes, sir.

16          Q.    How about before August of 2006,

17   were you employed?

18          A.    Yes.

19          Q.    Where were you working then?

20          A.    I had a couple of jobs.  I worked

21   at The Nutcracker.  I worked at Captain D's.  I

22   worked at Rex TV Appliance.  I can go on and on,

23   I mean --
```

```
 1          Q.     I'm trying to figure out say from
 2   when you began operating Club Rio, what job did
 3   you leave?
 4          A.     Rex.
 5          Q.     How long had you worked at Rex?
 6          A.     About two years.
 7          Q.     Was that your only job during that
 8   period, at Rex?
 9          A.     That was it.
10          Q.     What were you making at Rex?
11          A.     Let's see -- it was a commission
12   job, but it was like I at least made around
13   about 2,000 a month.
14          Q.     That would have been from about
15   say August 2006 going backwards about a period
16   of two years?
17          A.     Right.
18          Q.     Money remained about the same
19   during this period?
20          A.     Yeah.  I mean, it got better
21   during some months because of holidays and stuff
22   like that.
23          Q.     I guess, on average during a month
```

```
1    you were --
2         A.    It was average, yeah.
3         Q.    Mr. Davis, I have to ask you the
4    question.  I don't want to embarrass you, but I
5    need to ask you this.  Do you have any prior
6    arrests, other than a traffic violation?
7         A.    Yes.
8         Q.    What is the most recent arrest
9    that you had?
10        A.    Most recent is a --
11              MR. BULLARD:  Can we go off the
12   record.
13                    2:03 p.m.
14                    (Off the record)
15                    2:04 p.m.
16        Q.    I know we discussed earlier before
17   we started the deposition, there was an arrest
18   January 18, 2007?
19              MR. FOWLER:  The date in question
20   that the money was found.
21        Q.    Right.  Let me just start from
22   there.  Has there been an arrest after that
23   date?
```

1          A.     Yes.

2          Q.     What arrest is that?

3          A.     It was possession of cocaine.

4          Q.     Where did that happen?

5          A.     Here in Dothan.  Happened like --

6     specific street?

7          Q.     No.  I just need to know the

8     municipality or area?

9          A.     Leaving right about Flowers

10    Hospital.  I got pulled over and they searched

11    the car.  The guy claimed he found cocaine

12    residue.

13         Q.     Here in Dothan?

14         A.     Right.

15         Q.     What was the date?

16         A.     August.  I want to say around the

17    18th or 19th of August.

18         Q.     In 2007?

19         A.     Right.

20                MR. BULLARD:  Off the record.

21                     2:05 p.m.

22                (Off the record)

23                     2:06 p.m.

1        Q.     What is the current status of the

2    criminal situation regarding that August 2007

3    arrest?

4        A.     What's the current status?

5        Q.     Have you been to trial or is trial

6    set or are you -- do you know what the status

7    is?

8        A.     As far as -- no.

9        Q.     You have not entered a plea of

10   guilty in the case?

11       A.     No.  No.

12              MR. BULLARD:  Off the record.

13                   2:07 p.m.

14                   (Off the record)

15                   2:07 p.m.

16   BY MR. HARMON:

17       Q.     Mr. Davis, any another arrest from

18   the period of January 18, 2007 until today,

19   other than what we've already discussed?

20       A.     No, sir.

21       Q.     I want to talk more about the

22   arrest that occurred on January 18, 2007.  Do

23   you have any arrest prior to January 18, 2007?

1          A.     Prior to, yeah.  Probably about

2    five or six years ago.

3          Q.     Do you recall what the arrest was

4    for?

5          A.     It was for possession of marijuana

6    POM 2.

7          Q.     What was the outcome of that case?

8          A.     It was deferred prosecution.

9                 MR. FOWLER:  We call it pretrial

10   diversion.

11                MR. HARMON:  Did you guys

12   represent him on that?

13                MR. BULLARD:  No.

14         Q.     Other than that one arrest that

15   you just discussed that resulted in pretrial

16   diversion, anything prior to that?

17         A.     No, sir.

18         Q.     Okay.  I want to go -- let me ask

19   you this:  When I noticed the deposition, I

20   asked you to bring any documents or tangible

21   physical things to support your claim.  Did you

22   bring anything?

23                MR. FOWLER:  I think we sent them

1    to you actually.

2                    MR. HARMON:  Is that the same

3    materials you sent to me earlier?

4                    MR. FOWLER:  Yeah, the income tax,

5    the checks, the loan papers.

6                    MR. HARMON:  That would have been

7    the income tax refund anticipation loan?

8                    MR. FOWLER:  No, we actually have

9    the check that date of the arrest.

10                   MR. HARMON:  Yeah, there is a

11   check, I believe, from --

12                   MR. FOWLER:  HSBC.

13                   MR. HARMON:  HSBC.

14                   MR. FOWLER:  It has to do with his

15   tax returns.  Should be the same document.

16                   MR. HARMON:  That's it.  That's

17   what I have seen.  I am not going to attach it

18   to the deposition.  Anything other than that, I

19   think you also had some --

20                   MR. FOWLER:  Here is the loan

21   agreement.

22                   MR. HARMON:  That was in there.

23                   MR. FOWLER:  The checks, from Club

```
1    Rio.  Doing business as Club Rio, Untouchable

2    Entertainment, LLC.

3                 MR. HARMON:  That is all the

4    materials he will admit as pertaining to this

5    case.

6                 MR. FOWLER:  Right now, that we're

7    aware of.

8                 MR. HARMON:  And you guys would

9    inform me, I believe.

10                MR. BULLARD:  Do you want to

11   attach those after you depose him?

12                MR. HARMON:  That would be fine. I

13   didn't bring copies, but that might be a good

14   idea when you get your redirect.

15        Q.    Mr. Davis, anything else?  Let me

16   back up.  You have seen what your attorney has

17   submitted.  Is there anything else that you

18   could be aware of that, perhaps, you are just

19   now thinking of that you should have told them

20   or just occurred to you?

21        A.    No, sir.

22        Q.    Do you have any idea who your

23   potential witnesses will be if this matter
```

1    should go to trial?

2         A.    No.

3         Q.    Do you have anybody in mind?

4    Someone you think might be of benefit to you in

5    the case?

6         A.    No.

7         Q.    Not saying you should.  Just

8    asking.

9              MR. BULLARD:  Can we go off the

10   record, so I help to give him suggestions.

11             MR. HARMON:  I just want to know

12   what he knows.  I understand that you guys might

13   have to call other folks, but --

14             MR. BULLARD:  Like James Simpson,

15   the passenger in the car.  His girlfriend, who

16   owned the car.

17             MR. FOWLER:  The guy who gave him

18   the loan check.

19        A.    I didn't know you were talking

20   like --

21        Q.    I want to go to January 18, 2007.

22        A.    Right.

23        Q.    Do you recall what happened that

```
 1   night?

 2         A.    Yeah.

 3         Q.    Did you go to Holiday Inn Express

 4   that night?

 5         A.    I did.

 6         Q.    About what time?

 7         A.    Maybe around 10, 10:30.  Somewhere

 8   like that.

 9         Q.    At night?

10         A.    At night.

11         Q.    Were you in a vehicle?

12         A.    I was.

13         Q.    Whose vehicle was it?

14         A.    My girlfriend's.

15         Q.    What's her name?

16         A.    Deanna Cobb.

17         Q.    Will you spell the last name?

18         A.    C-O-B-B.

19         Q.    Where does Ms. Cobb live?

20         A.    Right now, she lives with her

21   sister.

22         Q.    Is that in Dothan?

23         A.    Dothan.
```

1         Q.      And are you and Ms. Cobb still

2    boyfriend/girlfriend?

3         A.      Yeah.  We have a child together.

4         Q.      Now, why did you go to a Holiday

5    Inn Express that night?

6         A.      I went to the Holiday Inn Express

7    that night because a friend of mine -- we were

8    getting ready to go out to the club.  A friend

9    of mine called me to come pick him up to take

10   him home to go get his clothes and stuff.

11        Q.      Who is this friend?

12        A.      James Simpson.

13        Q.      Why was Mr. Simpson at the Holiday

14   In Express this night?

15        A.      I have no idea.

16        Q.      Did you have a handgun with you on

17   that night?

18        A.      Yes, sir, I did.

19        Q.      Why did you have the weapon?

20        A.      I carry it, I mean, I just carry a

21   weapon.  I had a permit.  No particular reason I

22   had it, it just rides in the car with me.

23        Q.      And did you say you had a gun

```
1    permit at that time for the weapon?
2         A.    Yeah.  I just didn't have it with
3    me.
4         Q.    What county issued the permit?
5         A.    Houston.
6         Q.    Had you rented a room there at the
7    Holiday Inn?
8         A.    No, sir.
9         Q.    Did your friend?  I think you said
10   his name is James.
11        A.    James Simpson.
12        Q.    Had he rented a room there?
13        A.    No, sir, not that I know of.
14        Q.    Did you know anyone that had a
15   room there that night?
16        A.    No, sir.
17        Q.    Did you go up to a room at all
18   during the period of time when you went to the
19   Holiday Inn Express?
20        A.    No, sir.
21        Q.    Were you approached by the police
22   that night?
23        A.    Yes, sir.
```

1          Q.     What did they ask you when they
2    got there?
3          A.     I was leaving.  They pulled up and
4    jumped out of the car, and he asked me to get
5    out of car.  He said I was not being arrested,
6    just being detained and started searching my
7    pockets.  Put me in handcuffs and started
8    searching my car.
9          Q.     Somewhere during this initial
10   contact, did he ask you if you had a weapon?
11         A.     Yes, sir.
12         Q.     What did you tell them?
13         A.     I said yeah.
14         Q.     Did you --
15         A.     I told them where it was at.
16         Q.     Was this before or after you were
17   handcuffed?
18         A.     They were handcuffing me.  I was
19   in cuffs.  That was the immediate thing from
20   the jump, get out of the car, I got put in
21   handcuffs.
22         Q.     Did the officers ask you if you
23   had a pistol permit for the weapon?

1          A.     No, sir, they didn't ask.  I just
2     had to tell them.  I just told them that.
3          Q.     You have that pistol permit on
4     your person?
5          A.     No, sir.
6          Q.     Was it in the vehicle that night?
7          A.     No, sir.
8          Q.     After the police approached, you
9     told them about the weapon.  You had been
10    handcuffed, what happened next?
11         A.     After -- say it one more time.
12         Q.     After the police initially
13    approached, you told them about the weapon.
14    They handcuffed you.  What happened next?
15         A.     They pulled me aside and started
16    searching my car.
17         Q.     Did they pat you down at any
18    point?
19         A.     Yes.
20         Q.     Before or after they searched your
21    vehicle?
22         A.     That was before.
23         Q.     Did they tell you they felt

```
 1   anything during the pat down of your person?
 2         A.    Did they say they felt anything?
 3         Q.    Yes.
 4         A.    They didn't mention anything about
 5   feeling anything.
 6         Q.    What did they tell you during the
 7   pat-down, if anything?
 8         A.    They didn't tell me nothing at
 9   all.  All they told about not being arrested,
10   being detained.  They pulled me away from the
11   car and started searching the car.  I stood
12   there while they searched the car.
13         Q.    Did any police officer ask you
14   about he felt something in one of your pants
15   pockets and ask you about the item he felt?
16         A.    No.
17         Q.    At any time, did you tell the
18   police officer you had money in your pocket on
19   your person?
20         A.    Did I tell?  Yes, sir, when they
21   was getting ready to put me in the car, one
22   officer stopped me, and he patted my pocket and
23   pulled money out of my pocket.
```

1        Q.      What did he say when he pulled the

2   money out of your pocket?

3        A.      He just said -- he didn't say

4   nothing.  I got to asking him why are you taking

5   my money and stuff like.  He didn't say nothing.

6        Q.      Do you tell them about the source

7   of the money at this time?

8        A.      Yeah, I told them.  I mentioned

9   about having just gotten a tax return check.

10  That's why one of the officers asked me about

11  how you got money in your pocket.  That's when I

12  got to telling them how I had the money in my

13  pocket.

14       Q.      Now, the police officer, if the

15  police officers said they smelled a strong odor

16  of marijuana in a vehicle; was that correct?

17       A.      Did they say that?

18       Q.      If they said that, would that be a

19  correct statement?

20       A.      That would not be correct.

21       Q.      During the time you were operating

22  the vehicle, you did not notice a strong odor of

23  marijuana?

1          A.      No, sir.

2          Q.      If the police officer said there

3    was residue amount of marijuana in the vehicle,

4    would that be a correct statement?

5          A.      No, sir.

6          Q.      When you were driving the vehicle,

7    did you observe or see marijuana in the vehicle?

8          A.      No, sir.

9          Q.      The gentlemen that you picked up,

10   Mr. Simpson, did you know he had marijuana on

11   his person?

12         A.      I did not.

13         Q.      Okay.  I know you said you told

14   the police officer that came from your tax

15   refund.  Did you tell them any other source at

16   that same time?

17         A.      I said I ran a club, and then the

18   guy asked me what club.  I told him what club.

19   He said, "You are going to have to prove that in

20   court."  They took the money.

21         Q.      Now, back on January 18, 2007, did

22   you have a bank account, Mr. Davis?

23         A.      No, sir.

1          Q.     Did the Club Rio have a bank

2    account?

3          A.     Yes, it did.

4          Q.     Were you an authorized signature

5    or authority on that bank account to Club Rio?

6          A.     Yes, sir.

7          Q.     You could write a check on that

8    bank account?

9          A.     Right.

10         Q.     What would you use the Club Rio

11   bank account for?

12         A.     To make deposits, deposit money

13   and buy, like, liquor and buy supplies.

14         Q.     Do you have a bank account now?

15         A.     No, sir.

16         Q.     Have you ever had a bank account

17   in your own name?

18         A.     Yeah, a while ago.  Maybe four or

19   five years ago.

20         Q.     Is Club Rio still open?

21         A.     As of this time, no.

22         Q.     When was it closed?

23         A.     It was closed, I would have to ask

```
 1    my sister to get the actual time frame.  It was

 2    closed because, you know, it was me and her

 3    running the club.  She handled that part, but I

 4    was authorized.  But she handled that part, but

 5    I could get the date and stuff from her.

 6          Q.    Was this a Wachovia bank account?

 7          A.    It was.

 8          Q.    Was is at a local bank here in

 9    Dothan?

10          A.    It was.

11          Q.    When did Club Rio close?

12          A.    It closed maybe the second week in

13    July.  Not July, January.  Sorry, second week in

14    January.

15          Q.    Did you make money with Club Rio?

16          A.    I did.

17          Q.    Why did you close Club Rio ?

18          A.    It started off good, but we had

19    one bad incident and business went away and we

20    couldn't -- we felt like we needed to close it

21    down for a little while and open it back up

22    later on because business had faded away.

23          Q.    What was the bad incident?
```

1          A.     One night, police came in the club

2     and took a guy to jail -- put him on the floor

3     and put him in handcuffs and took him to jail.

4     Since that day, we were having to fight to keep

5     the business.

6          Q.     Do you know a man named Alton

7     Rivers?

8          A.     Yeah, I know of him.

9          Q.     How well do you know Mr. Rivers?

10         A.     We hung out before.  We went to

11    school together and stuff like that.

12         Q.     Was Mr. Alton Rivers present at

13    the Holiday Inn that night when the money was

14    seized?

15         A.     Not that I know of.

16         Q.     Did you see him there that night?

17         A.     I didn't see him.

18         Q.     How about a person, I hope I

19    pronounce this right, Keyone Edward Johnson?

20         A.     Uh-huh, (affirmative).

21         Q.     Do you know him?

22         A.     Yeah, I know him.

23         Q.     How do you know Mr. Johnson?

1        A.      Same.  I seen him out before.

2    Went to school together, kind of around the same

3    age.

4        Q.      Did you see Mr. Johnson there that

5    night?

6        A.      No, sir.

7        Q.      Were you aware they had rented

8    rooms there at the Holiday Inn Express that

9    night?

10        A.      No, sir.

11        Q.      Now, the -- I believe you were

12    present when your attorneys discussed earlier

13    there was some document that you submitted as

14    supporting your claim.  Also, I see in there,

15    there was -- you indicated there was a loan from

16    First Franklin in the amount of $2,306.97.  When

17    did you borrow this money?  What date?

18        A.      11/27/06.

19        Q.      For what purpose did you get this

20    loan, Mr. Davis?

21        A.      Just to like pay off some bills,

22    you know what I'm saying, small bills and stuff.

23        Q.      And did First Franklin advance

1    this money to you by check?

2          A.    Yeah, they did.

3          Q.    What did you do with that check?

4          A.    Cashed it.

5          Q.    Where did you cash it?

6          A.    I want to say I went to their

7    bank, SouthTrust, I think.  Wherever their bank

8    is at.

9          Q.    Why did you cash the check,

10   Mr. Davis?

11         A.    I needed the money.

12         Q.    I guess -- I understand.

13         A.    I guess I cashed it, because it

14   was a check.

15               MR. FOWLER:  Can we clarify that.

16   Why else you would have a check.

17         Q.    At the time that you got this

18   check, the Club Rio bank account wasn't in

19   existence, correct?

20         A.    It was.

21         Q.    Any reason you would have cashed

22   it rather than deposit it into the Club Rio

23   account?

1          A.       Why would I have done that?

2          Q.       Why?

3          A.       I wasn't going to put my personal

4    money with the business money.  I wasn't going

5    to do that.

6          Q.       Anyone else borrowing the money

7    besides yourself?

8          A.       No, sir.

9          Q.       And so you cashed the check right

10   around the date that you got it -- November 27,

11   2006?

12         A.       I might not have -- I may have

13   waited a week or two after that.

14         Q.       Sometime around the first of

15   December?

16         A.       Right.

17         Q.       Did you keep that amount of cash

18   with you until the events of January 18, 2007?

19         A.       Did I keep it?

20         Q.       Yes.

21         A.       I may have kept some of it, maybe

22   for Christmas and stuff like that.  I probably

23   kept some of it.  I wouldn't have spent that

1    much.

2          Q.     I think you obtained an amount of

3    $3,306.97.  Do have any idea how much of that

4    was spent as of January 18, 2007?

5          A.     No, I couldn't tell you.

6          Q.     The other -- one of the other

7    things you submitted is a check from HSBC?

8                 MR. FOWLER:  That is the tax

9    check.

10         Q.     Tax check, right.  Which I took

11   that to mean that was an income tax refund

12   anticipation loan?

13         A.     That was a check.

14         Q.     I understand that.  Did you go

15   somewhere and get a loan based on your expected

16   income taxes?

17                MR. FOWLER:  Can I clarify this?

18   IRS check, you wanted your money quick, right

19   then, you went to them, and they gave you a

20   check for doing it fast and handed it to you.

21         A.     Right.

22         Q.     In other words, this was a loan

23   which was guaranteed by your income tax refund?

1          A.      Yes, yes.  Yes.

2          Q.      That was HSBC?

3          A.      Uh-huh.

4          Q.      Do you recall how much income tax

5     you were getting back?

6          A.      Do I recall?

7          Q.      Yes.  What your income tax for

8     that period showed as your potential refund?

9          A.      Around 4 or $5,000.

10         Q.      And you got this check on the day

11    of the arrest?

12         A.      Exact same day.

13         Q.      Let me ask you this.  It's obvious

14    from the document, HSBC advanced you a check; is

15    that correct?

16         A.      Right.

17         Q.      Did you cash that check?

18         A.      I did.

19         Q.      Where did you cash the check?

20         A.      At Chandlers.

21         Q.      Chandlers?

22         A.      It's like a -- kind of like a

23    food-mart, like Chandlers.

1          Q.     Like a grocery store?

2          A.     They cash checks.  They cash

3     checks and stuff.

4          Q.     They're in the business of cashing

5     checks?

6          A.     Right, they're in the business of

7     it.

8          Q.     How much did they charge you for

9     cashing that check?

10         A.     Maybe a hundred bucks.

11         Q.     Did you attempt to cash the check

12    at Wachovia where you had the bank account?

13         A.     No.

14         Q.     Any reason why you did not attempt

15    to cash it there as opposed to going to a check

16    cashing service?

17         A.     No, no particular reason.

18         Q.     Had you had a chance to spend any

19    of that money before it was seized on that

20    occasion?

21         A.     No, sir.

22         Q.     Other items that were advanced?

23    There was a check from a business venture, one

1    was dated September 4, 2006 in the amount of

2    $1,000.  What business was that advanced that

3    amount of money to you?

4            A.      Club Rio.

5            Q.      Did you essentially write a check

6    to yourself from the Club Rio account?

7            A.      No.  The way it worked, my sister

8    would pay me.  She would write my check.

9            Q.      And she is the one that wrote the

10   check for $1,000?

11           A.      Right.

12           Q.      What did you do with that check,

13   cash it or deposit it?

14           A.      I cashed it.

15           Q.      Where did you cash it?

16           A.      At Wachovia.

17           Q.      Would it be your testimony that

18   you kept the $1000 with you from September 4,

19   2006 until January 18, 2007?

20           A.      I mean, I may have kept some of

21   it.  I don't know.

22           Q.      Do you believe, as you recall, did

23   you spend any of that $1,000 during that period

1    from September 4, 2006 to January 18, 2007?

2          A.    Yeah, I may have spent a little

3    bit.

4          Q.    There's also a check, and I think

5    it's dated October 2, 2006.  And I believe,

6    based upon representations that your attorney

7    made to me earlier, and you have a different

8    recollection, you certainly state that, although

9    the amount of the check is not written out, you

10   told your attorney it's for $1,000.  Do you

11   recall that check?

12         A.    The one that doesn't have the

13   amount written on there?

14         Q.    Yes, that's correct.

15         A.    Yes, I recall that.

16         Q.    Was it exactly for $1,000?

17         A.    Uh-huh, (affirmative).

18         Q.    October 2, 2006, is the correct

19   date when you got that check?

20         A.    Right.

21         Q.    Who wrote that check to you?

22         A.    My sister.

23         Q.    Did you, in turn, on that $1000,

1    what did you do with it?  Did you deposit the

2    check or cash the check?

3        A.    I cashed it.

4        Q.    Did you keep the $1000 with you

5    from October 2006 to January 2007?

6        A.    Yeah.  I started saving money.  I

7    wanted to buy a car, so I started saving money.

8        Q.    You say you were saving?  Where do

9    you keep the money while it was in your

10   possession?

11       A.    I would keep it on my person, like

12   with me.

13       Q.    At all times?

14       A.    Yeah.

15       Q.    Now, the last one I see, and again

16   this was a Club Rio check?

17       A.    Right.

18       Q.    Last one I see is November 21,

19   2006 check in the amount of $3,000?

20       A.    Yes.

21       Q.    Is that a Club Rio check?

22       A.    It was.

23       Q.    Was it written by your sister?

1          A.    Right.

2          Q.    What did you do with that check?

3    Cash it or deposit it?

4          A.    I cashed it.

5          Q.    Did you keep that money with you

6    until January, 2007?

7          A.    Uh-huh, (affirmative).

8          Q.    All three of these checks were

9    issued to you for what cause?  What did you do

10   to obtain them?

11         A.    I worked.  I was part owner of the

12   business.

13         Q.    Was this, for example, money paid

14   to you for your efforts in the furtherance of

15   the business?

16         A.    Right.

17         Q.    Now, the amount of money that was

18   seized was, I believe, $12,204?

19              MR. FOWLER:  One of those somebody

20   said 14, the Department of Justice.

21              MR. BULLARD:  They had those

22   wrong.  They finally came back and said -- can

23   we go off the record?

```
 1                    2:32 p.m.

 2              (Off the record)

 3                    2:34 p.m.

 4    BY MR. HARMON:

 5         Q.    Okay.  Mr. Davis, you heard what

 6    your attorney just said about the other source

 7    of the money.  I think you indicated to me

 8    earlier, you were not working anywhere but Club

 9    Rio during this period?

10         A.    Right.

11         Q.    Other than the loan from First

12    Franklin, the tax advance loan from HSBC, and

13    the three checks that I just discussed, where

14    did any other money you had during that period

15    come from?

16         A.    All the money came from the club

17    itself.  The club, it's a cash business, you

18    know.  We dealt with cash.  You know, so you

19    know, I would do stuff like go to the bank, get

20    money stuff like that.  It was a cash business,

21    so that when he's saying on the night like a

22    good night we take the cash ourselves, and we

23    count it.  We count it, we deposit like --
```

```
 1    because it's our business.  I guess you could
 2    say it was a family business, because it was our
 3    business, me and my sister.  So all the money
 4    that I got from the business, it didn't you
 5    know, get paid as a check, not all of it.  You
 6    know what I'm saying?  We decided we pay.  She
 7    decided she would pay me for my services.
 8         Q.    When you got that money, would you
 9    get it cashed on the night it was earned?
10         A.    Right.  We deposit the rest.
11         Q.    Did she give you a receipt for it,
12    or you give her any receipt that you had
13    obtained this money, any type of written
14    documentation or receipt?
15         A.    No.
16         Q.    For the purposes of profit and
17    loss for taxation, how did you keep up with the
18    amount of money that was earned?
19         A.    She did that.  I left that up to
20    her.
21         Q.    To your knowledge, were there any
22    state tax returns that were to be filed.  Let me
23    back up and ask about this.  Did you sell liquor
```

1    at the club?

2          A.    Yes, sir.

3          Q.    Were there taxes due to the state

4    of Alabama based on the amount of liquor sold at

5    the club?

6          A.    Yeah.

7          Q.    Who kept up with that?

8          A.    My sister did.

9          Q.    Did your sister keep a check

10   register or record for the Club Rio account

11   during the time it was open?

12         A.    Ask me that to make me -- keep up

13   with it --

14         Q.    Yeah, there was --

15         A.    -- checks written?

16         Q.    Let me back up and ask about this.

17   In many instances, people have a checking

18   account, they keep a register where they write

19   down checks that are written so they know how

20   much they've written?

21         A.    Right.

22         Q.    On a monthly basis, the bank

23   usually sends you a report of checks written and

1      a statement of account and that sort of thing.

2              A.      Right.

3              Q.      Did you get that or did your

4      sister?

5              A.      My sister got that.

6              Q.      Do you know if those documents

7      still exist?

8              A.      Not that I know of, no.  I mean,

9      not that I know of.

10             Q.      Was Club Rio incorporated?

11             A.      Meaning?

12             Q.      A corporation or?

13             A.      We had to open a corporation, open

14     as a business, yeah.

15             Q.      Who were the incorporators, you

16     and your sister, the people that formed the

17     corporation?

18             A.      Yeah.

19             Q.      Were you required to file a

20     corporate tax return with the state or federal

21     government?

22             A.      To be honest, with the corporation

23     part itself, my sister handled that part.  That

1    was her part to handle.

2         Q.    Were you aware that any tax

3    returns had been filed for Club Rio either with

4    the state or federal government?

5         A.    I'm not aware.  She would tell me

6    about she had to do taxes as far as like with

7    the business and the liquor and stuff like that.

8         Q.    Did you ever sign any tax returns

9    that you recall for Club Rio of any nature

10   whatsoever?

11        A.    No, I didn't.

12        Q.    Club Rio was opened during the

13   period between 2006 and 2007; is that correct?

14        A.    Right.

15        Q.    So any income you earned from Club

16   Rio during tax year 2006 would have been

17   reportable on your state and federal income

18   taxes for the tax year 2006?  Would that be

19   correct?

20        A.    Uh-huh.

21        Q.    Did you file a federal tax return

22   in the tax year 2006?

23        A.    Did I file one?

```
1              MR. FOWLER:  Can we clarify that?
2    You mean with Club Rio?
3              MR. HARMON:  No, I mean his
4    personal, your personal taxes.  Did you file a
5    personal tax return for tax year 2006 with the
6    federal government?
7         A.    When I went to fill out my taxes,
8    I filled out like a self-employee, like, I
9    guess, a I-9 or something like that.  Some kind
10   of form like that.
11        Q.    Again, I understand that.  Let me
12   put it like this.  Based upon the information
13   that you have given me, you had a tax refund
14   anticipation loan of $4,920 in January?
15        A.    Right.
16        Q.    Generally speaking, and I'm
17   speaking from my personal knowledge, correct me
18   if I'm wrong, you must have shown someone you
19   had a tax return where you anticipated getting
20   some sort of refund?
21        A.    Right.
22        Q.    That's my question.  Did you file
23   the tax return with the federal government?
```

1          A.     Yes.

2          Q.     Do you still have a copy of the

3    tax return?

4          A.     I think the tax people, the people

5    that do my taxes --

6          Q.     Who did your taxes that year?

7          A.     What is the name of that place?

8    It's right here on West Main on the right.  I

9    can't think of the name of the people.  It

10   wasn't like -- what is name of the people.  I

11   would have to find out.

12               MR. HARMON:  I can ask you guys

13   later.

14               MR. BULLARD:  Sure.

15         Q.     How about your state income tax

16   return?  Did they do it also?

17         A.     Right.

18         Q.     Before I get any further, I want

19   to ask you:  Have you filed any type of state

20   action or federal action alleging that the law

21   enforcement officers who arrested you on January

22   18, 2007 mistreated you or assaulted you

23   physically in any manner?

1          A.      No, sir.

2          Q.      Have you filed any action alleging

3    they violated any of your constitutional rights

4    on that night?

5          A.      No, sir.

6          Q.      Have you made any complaint to the

7    local police authority regarding your treatment

8    that night?

9          A.      No, sir.

10         Q.      I do want to go back to one thing

11   to make sure I understand.  The money you had on

12   you that night -- what I heard you say, correct

13   me if I'm wrong.  The source was your loan from

14   First Franklin, the three checks from Club Rio

15   we discussed, the check from HSBC, the tax, and

16   of course, additional cash money you took from

17   the Club Rio operating account during certain

18   periods of time?

19         A.      Right.

20         Q.      Was there any other source for

21   this money?

22         A.      No, sir.

23                 MR. HARMON:  I think that's all

1    the questions I got, gentleman.

2              MR. BULLARD:  I don't that you

3    want to -- he's already asked about them.

4              MR. FOWLER:  I want to clarify a

5    few things if that's okay.

6              MR. BULLARD:  Okay.

7                   EXAMINATION

8    BY MR. FOWLER:

9         Q.    Dealing with Club Rio, did your

10   sister handle the bookkeeping and financial

11   part?

12        A.    Right.

13        Q.    Did you have anything to do with

14   the bookkeeping and financial?

15        A.    No.

16        Q.    Did you ever sell or buy any drugs

17   from Keyone Edward Johnson or Alton Rivers?

18        A.    No.

19        Q.    Okay.  Is this the loan that you

20   got on 11/27/06?

21        A.    Right.

22        Q.    Was that amount $2,360.97?

23        A.    Right.

```
 1                    (Whereupon, Defendant's Exhibit 1

 2      was marked for identification.)

 3      BY MR. FOWLER:

 4           Q.    Did you receive a check from

 5      Untouchable Entertainment, LLC d/b/a Club Rio?

 6           A.    Right.

 7           Q.    Did you receive a check in the

 8      amount of $1,000 from Club Rio/Untouchable

 9      Entertainment?

10           A.    Yeah.

11                    MR. HARMON:  Is there a number on

12      that?

13           A.    This one says 1006.  I can't make

14      out the exact date.  I don't have the exact

15      check.

16                    (Whereupon, Defendant's Exhibit 2

17      was marked for identification.)

18                    MR. HARMON:  Is that the check

19      number?

20                    MR. FOWLER:  Yeah.

21           Q.    Did you receive a check for $3,000

22      from Untouchable Entertainment, LLC d/b/a Club

23      Rio check number 1035?
```

1          A.      Right.

2          Q.      And as Exhibit 3.

3                  (Whereupon, Defendant's Exhibit 3

4    was marked for identification.)

5          Q.      Did you receive a check from Club

6    Rio, Untouchable Entertainment, LLC for $1025 on

7    October 1st?

8                  MR. BULLARD:  We couldn't make out

9    the amount on this one.  I believe that's the

10   $1,000 check.

11                 MR. HARMON:  But your letter that

12   you sent to me indicated that your client had

13   said it was $1,000.

14                 MR. FOWLER:  Right.

15         Q.      This is it?

16                 (Whereupon, Defendant's Exhibit 4

17   was marked for identification.)

18   BY MR. FOWLER:

19         Q.      Exhibit four.  Did you receive a

20   check on or about January 18, 2007, the day of

21   the arrest, from your tax refund?

22         A.      Yes.

23         Q.      Was that amount $4920.05?

```
 1        A.      Yes.

 2        Q.      Is that the check from HSBC?

 3                (Whereupon, Defendant's Exhibit 5

 4     was marked for identification.)

 5     BY MR. FOWLER:

 6        Q.      He spoke about the incident at

 7     Club Rio which shut down the business.  Did you

 8     have anything to do with that?

 9        A.      No, sir.

10        Q.      Okay.  Did you save your money

11     this whole time?

12        A.      I tried.  I tried to.

13        Q.      Did you ever get tip money out of

14     the jar at Club Rio during this period?  Tips

15     put in there for alcohol.

16        A.      No, the bartender got that.

17        Q.      Okay.

18                MR. FOWLER:  That's all we've got.

19                MR. HARMON:  I have one more.

20                        EXAMINATION

21     BY MR. HARMON:

22        Q.      Mr. Davis, can you give me your

23     sister's name and current address?
```

1         A.      Ashley Davis.

2         Q.      Ashley Davis?

3         A.      Ashley Davis.

4         Q.      What's her current address?

5         A.      I can't think.  She stays in

6    Atlanta, Georgia.

7         Q.      Is she a resident now of Atlanta,

8    Georgia, or is she still a resident of Dothan?

9         A.      She's a resident of Atlanta,

10   Georgia.

11        Q.      All right.

12               MR. HARMON:  That's all I have.

13   Thank you.

14               ENDED AT 2:47 p.m.

15               FURTHER DEPONENT SAITH NOT

16

17

18

19

20

21

22

23

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA )

4    HOUSTON COUNTY    )

5

6            I hereby certify that the above

7    and foregoing deposition was taken down by me in

8    stenotype, and the questions and answers thereto

9    were transcribed by means of computer-aided

10   transcription, and that the foregoing represents

11   a true and correct transcript of the deposition

12   give by said witness upon said hearing.

13            I further certify that I am

14   neither of counsel nor of kin to the parties to

15   the action, nor am I in any way interested in

16   the result of said cause.

17

18                          COPY

19

20   _____
     APRIL BENDINGER, CCR
     CERTIFICATE NUMBER CCR-138
21
     My Commission Expires
22   June 8, 2008

23

**_BENDINGER & ASSOCIATES_**
**_334-798-0560_**